[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a marriage of over 20 years between an American woman and an Iranian citizen. The plaintiff wife was working at Xerox when, at age 20, she married the defendant who said he was then a medical student. He was then 34.
The marriage took place on October 18th, 1969, in New York City. The parties have continuously resided in this state for more than a year prior to the bringing of this action.
There are five children issue of this marriage, Kenneth born November 7, 1985, Nancy born April 29, 1977, Pierre born July 14, 1975, Daniel born February 21, 1973 and Lorraine born June 23, 1971. CT Page 2248
The marriage was, on the face of it, strange. Despite bearing five children, the plaintiff worked continuously taking time off only for the immediate period around the time of the birth. The defendant worked nights as a banquet waiter at the Sheraton Center in New York. He took care of the children during the day.
Plaintiff's work schedule required her to leave her home around 7:30 a.m. and return between 7:00 p. m. and 10:00 p. m. Consequently, her contact with the children was limited to weekends for the most part.
The marriage has broken down irretrievably with no possibility of reconciliation. The plaintiff left the marital home in March, 1989, and brought this action in April, 1989. The cause of the breakdown appears to be due to a number of things.
The first problem appears to have resulted from the agreement of the parties, according to the plaintiff's testimony, that she would be the career person and that her husband would take care of the children while she worked. She testified that she had on occasion turned down promotions she might have received because it did not work out with her having any time with the children.
In addition, however, it appears that the defendant had total control of the way in which the parties spent the money they had. The plaintiff turned her check over to the defendant, and he gave her money from it from time to time. However, it appears that the living conditions, despite the fact that both parties were working, were extremely crowded particularly when they lived in New York in a one room apartment with one or more children.
Moreover, they moved eleven times until they bought a house in Darien in 1987. The plaintiff testified that the eleven moves, particularly when they had children, was too much for her, and she, in effect, became ill suffering what she described as a clinical depression which resulted in her leaving her position at Xerox in July of 1987.
At the time that she left Xerox, she received a pension of $75,000.00 plus additional income from her salary altogether totalling $99,000.00. At that time the $75,000.00 was used by her husband to buy the house along with money from their joint savings account and money from his current income. The house was bought for $226,500.00 for cash. Nevertheless, there appeared to be substantial savings left over after paying for the house so that, at the time of the bringing of this CT Page 2249 action two years later, there was some $60,000.00 in one bank account, another $45,000.00 in the Bank of Melli of Iran.
There presently is a tax bill of $51,470.37 because the defendant refused to have the plaintiff have the tax deducted from her pension when she left Xerox.
The plaintiff described her situation in this marriage as "a terrible life." She said at one time she tried to kill herself and in June of 1988 she was hospitalized.
At the time that she left Xerox, apparently before buying the house, she wanted to take the children with her to Florida, but her husband said they would not go with her. Instead he wanted her to get a job not stay in the house. However, her remaining at home resulted in her exacerbating her depression to the point where she was staying in bed and was not able to get out of bed in the mornings for a considerable period. She lost her hair during this time and had to wear wigs.
In addition she testified to constant fighting at the home, both with the children and with her husband. The children, for example, checked everything she did, everything she bought.
While in the hospital, she was put on mood elevators and tranquilizers. While her hospitalization lasted three weeks, she continued on the medication for eight months. It appears that the combination of her work schedule plus the moves plus what she perceived to be the control of her husband over the finances and all of the activities of the family produced the depression from which she appears to be still not entirely recovered. In fact now she's only working a few days a week at Bradlees at a pay rate of $5.00 an hour.
While an exhibit introduced by the defendant suggests that she is deliberately keeping her working hours down and her earnings (see exhibit one), at the same time her living arrangements, a one room apartment in contrast to the three bedroom house in which she was living with her husband and children, seems somewhat masochistic if in fact she was reducing earnings deliberately. In fact, if she was doing so, it would strengthen the court's opinion that she is still suffering from depression and is really not capable of acting rationally.
Apparently she has recognized her inability to handle the children, for example, and agrees that physical custody of the children should be given her husband. At the same time, she has asked for joint legal custody. CT Page 2250
The other reasons for the breakdown of the marriage appear to be the constant arguments, either with her husband or the children who apparently have no respect for her, and who may in that respect mirror her husband's treatment of her.
The plaintiff's perception of her place in the marriage was well illustrated by her testimony that the only place that she felt she had any respect was at her work and that her marriage was a kind of bondage.
When she started living home, her husband gave her $10.00 a day for miscellaneous items. He did the grocery shopping. He then complained about the gas she used to drive the children to their various jobs or school activities. Furthermore, he urged her to return to work despite her apparent illness.
She did, however, try to look for work wearing a wig because she had lost her hair as a result of her problems. She also had a problem with an infection in her hand which required skin grafting and which she said her husband refused to have done even though her insurance would have covered it, at least in part.
The financial situation has been somewhat exacerbated by the actions of the defendant once the divorce was started. He immediately transferred some $60,000.00 out of their joint bank account, $20,000.00 of which he used to buy a car for cash and the remainder he transferred to the oldest daughter allegedly to pay for a school in which she was not yet entered for her to enter in the fall, part of the balance was to pay for dental work for him which had not been done, part to finance Daniel's going to California, the reason for which was not explained, and part for expenses. None of these alleged uses were proven. There is also the $45,000.00 in the bank in Iran which may or may not be available at this time, and there is the house upon which there is no mortgage.
The defendant testified that his earnings have been reduced because of the rehabilitation of the Sheraton Center which is ongoing, but it is not clear what his earnings are. There is no W2, and he does not file income tax returns and apparently never has. His wife testified to this and it was not denied by him. His earnings in the past amounted to $45,000.00 to $55,000.00 a year.
The defendant has filed three affidavits in this matter, two in May, one on the third and one on the 23rd, and one in July on the 24th. Comparing the three affidavits reveals CT Page 2251 the following differences among them:
May 3 May 23 July 24 1. Income $900.00 week $900.00 week $260.00 week 2. Value of House $190,000.00 $220,000.00 $166,000.00 3. Savings $4,680.00 $76,680.00 $6,300.00
4. Motor Vehicles: 1985 Pontiac $4,000.00 $4,000.00 1990 Volvo $18,000.00
In none of these affidavits is there any indication of his pension to which he testified somewhat vaguely nor does he list his alimony payments which he was ordered to make of $150.00 a week.
In addition, in the May 23rd affidavit he lists deductions for taxes which he did not list on the May 3rd one nor does he list any on his July 23rd one. His wife testified that he paid no taxes and that was not denied by the defendant.
Additionally, under liability, he lists his VISA bill on which he pays some $9.00 and change a week. On the stand he said he was responsible for the hospital bill which is listed in the plaintiff's affidavit and the court finds that he is also responsible for a large part of the tax bill which the plaintiff is charged with owing because she failed to pay taxes on her $75,000.00 pension. Her failure to do so was because her husband instructed her not to take the deduction. Consequently, he should at least pay the penalty and interest on the pension as well as a share in the tax itself, since all of the pension went into the purchase of the home of which the defendant presently has exclusive possession along with the five children.
The defendant has explained his reduction in income in July on the fact that the Sheraton Center, where he works as a banquet waiter, is undergoing renovations. He, however, makes a number of somewhat contradictory statements; to wit: if he leaves the job at the Sheraton, he will lose thousands of dollars in severance pay; he does not expect to have a job in September but he does know people in the union so he will be getting another job; he doesn't expect the Sheraton to reopen although he knows that the Democratic convention is going to be there in two years and part of the reason for the renovation is in preparation for that event. In addition, the amount he says he receives for unemployment compensation, for which there was no verification seems strangely at odds with the amount he claimed he was receiving in pay.
Further, while he admits that he gets a pension and CT Page 2252 will get a pension at age 65, he claimed ignorance of what he would get or what the amount was, simply that he was getting it through the union.
On the face of the fluctuations in his weekly earnings on his affidavit and on the basis of his earnings in the past from his own testimony of between $45,000.00 and $55,000.00 a year up to and including June of this year, the court will use his earning capacity as a basis for determining the amount of alimony he should pay. The kind of work he does is not confined to any particular location but may be performed in any hotel or restaurant and it is, therefore, likely he could get a job if he wished to and could earn what he had been earning previously once he decided to make the break from the Sheraton.
The plaintiff, on the other hand, was making $40,000.00 a year back in 1987 but has not made anything like that since. In fact, she has been hospitalized. She has been under medication; she did try to go to work following the filing of the papers and for a time was working 65 hours a week at two jobs. She soon found she could not keep this up because of the strain involved in the proceedings themselves and the attitudes of her children and the delays to which she was subjected by her husband in receipt of her alimony. At one hearing, for example, she was awarded $750.00 which apparently represented five weeks back alimony. (See file.) The court does anticipate that the plaintiff will eventually be able to earn more than she is earning at the present time out perhaps not as much as she did at Xerox where she worked for some 20 years.
Since the earning capacity on which the court plans to rely of the defendant is over the guidelines, the guidelines will not be applied.
While it is not entirely clear whether both parties have asked for joint legal custody, it is clear that they are agreed that the defendant shall have sole physical custody of the children. Neither appears to have asked for sole legal custody.
On the basis of the evidence as delineated above and of the factors listed in 46b-81 and 46b-82, the court makes the following findings and orders.
 1. The marriage has broken down irretrievably with no hope of reconciliation, and it is hereby dissolved.
 2. The defendant shall have sole physical custody of the minor children and shall also have exclusive possession of the marital home. CT Page 2253
 3. The court finds it is in the best interests of the minor children that the parties share joint legal custody of the children with the plaintiff exercising the following rights or visitation.
 a. She may visit with the youngest child every Saturday or Sunday at her option and with any of the other children who wish to see her between 10:00 a.m. and 5:00 p. m. so long as she gives notice to the defendant of the day she will come at least 24 hours in advance. She may take the child or children out of the home or visit in the home at her option.
 b. She may visit with the other children at such time as she and they may mutually agreed to do so.
 c. She may also visit the youngest child and any other child who wishes to see her on Wednesdays between 5:30 p. m. and 8:30 p. m., but these visits are to take place out of the home.
Joint legal custody means that both parties must agree on all major decisions concerning the children including but not limited to their place of residence, their school, their medical care and their exposure to religious teachings. All medical and school reports shall be sent directly to both parties. The defendant shall notify the schools the children attend and any doctor treating them of the plaintiff's name and address and legal status as their joint custodian.
 4. The defendant shall pay the plaintiff Two Hundred ($200.00) Dollars a week as alimony for five years from the date of this judgment or until her earnings from her employment grosses $20,000.00 a year, whichever event occurs sooner. At that time the amount of alimony shall be reduced to One Hundred ($100.00) Dollars a week and shall continue until her death, remarriage or cohabitation. 5. The defendant shall pay to the plaintiff as her share of their major asset, the marital home, $90,000.00 to be paid in four monthly installments of $22,500.00 each on the first day of each month beginning November 1st, 1990. The defendant may obtain a home equity loan or mortgage to provide these payments, and the plaintiff shall cooperate in the obtaining of such a loan for that purpose.
 6. When plaintiff has received the full amount, $90,000.00, she shall forthwith sign a quitclaim deed to the defendant of all her right, title and interest in the home. CT Page 2254
 7. The plaintiff shall also pay one half the tax bill due on the filing of her return in 1987; to wit, $15,106.00. The defendant shall be responsible for the balance of the tax underpaid plus the interest and penalities assessed which are presently charged to the plaintiff and are represented by exhibit A, and he shall hold the plaintiff harmless against any such liability
 8. The plaintiff shall also pay the sum of $12.50 a week per child as child support after she has been receiving alimony as ordered herein for four (4) consecutive weeks, and the child support payments shall continue for each child until he or she reaches the age of 18.
 9. The defendant shall pay to the plaintiff Twenty Thousand ($20,000.00) Dollars representing one third of the Sixty Thousand ($60,000.00) Dollars in joint savings which he withdrew during the pendency of this action.
 10. The defendant shall provide medical coverage for the plaintiff for a period of three (3) years from the date of this judgment through his union or employer insurance, and shall pay for the same until such time as the plaintiff obtains coverage through her employment when the plaintiff's obligation to provide this insurance shall cease.
 11. The defendant shall be responsible for the payment of the Stamford Hospital bill, as he agreed to do during the trial, listed in the plaintiff's affidavit.
 12. The defendant shall contribute $2,500.00 to the plaintiff toward her attorney's fees.
 13. Each party shall pay all the other liabilities listed on her or his affidavit.
 14. The plaintiff is entitled to one half the value of the defendant's pension as of the date of this judgment. The plaintiff shall prepare an appropriate order to effectuate this award and shall present the same to the court for its approval.
 15. A wage execution shall issue for the orders of alimony and support ordered above, one on the plaintiff and one on the defendant, one week after the payments of alimony or support, as the case may be, become due.
 16. The plaintiff's maiden name of Linda Ryan may be restored. Judgment may issue in accordance with the foregoing.
MARGARET C. DRISCOLL STATE TRIAL REFEREE CT Page 2255